Case number 18-12061. Whenever you're ready, Mr. Anderson. May it please the court, my name is Alan Anderson and I represent Officer Eric Parker, both in the defense of the Fourth Amendment excess of force claim remaining against him, as well as the state law assault and battery claim that remains against him. The primary issue before this court is whether the district court erred when it failed, when it refused to grant qualified immunity to Officer Eric Parker after he utilized a constitutional use of force, a takedown on an unhandcuffed suspect who had already shown signs of flight, who was not answering the officer's questions, and who could be reasonably viewed as resisting a lawful pat down by head and foot during the investigation of a possible burglary. And the answer to that question, your honors, is the court did err and it erred for two reasons. First, the use of force here, the takedown, was constitutional. And it was constitutional whether we look at this court's decisions under the de minimis principle, that is these court's decisions under cases like Croom and Sullivan. Well, counsel, I don't understand the law to respond to some variant takedown to capture all types of, quote, takedowns. I looked at that video. And as I looked at the video, and I'm going to tell you my reaction to it, and you tell me where I'm mistaken. The individual was being detained at that particular point. He had turned his arms up and held it in his thumbs. That's a traditional police hold, and it's very effective. And then what happens is another car comes up, another police car, which is the filming car. And now the senior guy comes to show them how to do this. But I noticed very conspicuously that what happened was that he then moves his left foot out. And that's preparatory to a sweep. And then looking over his shoulder, and then he takes the guy down with that force. Now, that movement to the left foot is preparatory to that. And that's what he did when the other car came up, and he took him down with force. Now, my question is the necessity of the force. And if you take the sweep, is it difficult? You can take down the individual a different way. The sweep takes their feet out from under them, and the body now falls just that far. And that's what causes the injury. Of course, here you have an individual susceptible to injury, and I recognize that. But I wanted to tell you forthright that that's what my reaction was in looking at that video. Yeah, and that's an absolutely fair reaction. But I think what we have to do is look at what happened prior to the takedown, and not only what led up to it, but immediately prior to the takedown. And by that, we had a suspect here who, when the officers rolled up, the trainee, Officer Andrew Slaughter, as well as Officer Parker, the suspect acknowledged him, waved at him, started to walk away. They get out of the car. They call him to them. He responds, and he admitted, I think it's footnote eight of the court's opinion, that he understood some English. He recognized them as officers. But he didn't understand a lot of English, and the officers themselves recognized that he didn't understand English. They commented on that fact. Which, of course, complicates the ability to ascertain whether or not there's a burglary going on or whether or not he poses a threat to the officers. Now, what he did was understand enough to know they wanted to talk to him. And, of course, he said, Indian, no English, and walked away two steps. He walks back when he's called over a second time, so he understands that, and again says, Indian, no English, home, 148, walking, walks away seven steps. They then go chase him down again. He then again says, I mean, it's not really much of a chase, is it? That's correct, Your Honor. I apologize. They pursued him. It's not like he was running. He was moving away. And, in fact, in the third time, he took nine steps, Your Honor. But here's the key. He's moving away. He doesn't really understand English very well. He's not trying to elude them. I mean, stop me if you think I'm wrong about any of this. Well, Your Honor, I think we have to look at it from the perspective of the police officer. The police officer is not certain he doesn't understand English, thinks he might not. Except that the officer has said now, I think on three separate occasions, he doesn't understand English. That's what he's telling the other officer. Yes, Your Honor. Well, don't we have to rely on his own words? I mean, why would we not rely on his own words? I think we can, Your Honor. But whether or not the suspect understands English doesn't make it any more or less likely that he is potentially committing a burglary.  And if I can get back to Judge Higginbotham's question. Well, except that, it does make it more or less likely that he's intentionally not following directions, right? I mean, if he doesn't understand the directions, then he can't be intentionally not following them. And if your officers understand that he doesn't understand the directions, then how can they rely upon that in order to bolster the idea that force is needed? Well, first of all, he was following some of the directions. He did come over to the officers when it was requested the first two times. When they approached him on the third time he walked away, the nine steps, he did stop. As you point out, Officer Parker did go behind him, secure him like this with his right hand with two fingers. He wasn't walking away when they swept him off his feet, was he? Actually, Your Honor, on page 12 of Judge Hopkins' opinion, she notes, and there's no dispute on this, that number one, he'd been told three times, don't jerk away. I saw that, and I also saw the video, and I couldn't see that. And that's the same video the district court looked at. Yes, Your Honor. And the district court concluded that just prior to the takedown, Mr. Patel did turn his head and he did take a step away. At that point, the officer— That didn't happen. Now, you can argue that, to me, you can—what I saw, the only—possibly there was some movement of the hand, but the feet did not move. I looked at it. I go and look at it again. And he's already obtained. It's in a residential area. It's afternoon. There's no traffic. There's nothing else going on out there. It's a very quiet, peaceful residential area. Yes, Your Honor. Well, what I will point out, it was also an area that was subject to burglaries. But in terms of the video— That was the officer's later statement about burglaries. The report to them was there was an individual in the neighborhood, and the report did not say anything about burglaries. It's just an individual that they didn't recognize. No, Your Honor. Actually, the report was there was an individual walking through yards. There was an individual looking into garages. There was an individual looking into windows that was not recognized and had not been apparently in the neighborhood before. There not were. Now, with respect to the video, I want to point this out because I think this is important. The video that's in the—that actually is in the appellee's brief is a video that the only video forensic expert that's been in this case, that's been accepted, Grant Fredericks, has said cannot be relied upon to show small movements. At best, you get gross, larger movements. And with respect to those gross, larger movements, Your Honor, I would encourage you to look at the court's opinion on page 12. Everyone agrees that Mr. Patel at least moved his head in the direction of Officer Parker during the pat-down and took at least one step. When Officer Parker felt that movement, Your Honor, as a reasonable officer, not able to ascertain whether Mr. Patel may or may not have weapons on him, he did, frankly, what this court's law has suggested is appropriate and took him down. Now, the only—we had two use of force experts here, both our Chief Dunstan, our expert, and Jack Ryan for the city. And Jack Ryan testified, undisputedly, that the safest thing for an officer to do if he can't ascertain whether the subject has a weapon is to take him down, limit his ability to move. The ground's the way to do that. Now, it was not—it was not a great takedown, Your Honor, and I acknowledge that. And unfortunately, Officer Parker said he lost his balance. But he also said, and this is undisputed, I tried to steer him towards the grass to minimize the potential of any injury. He did suffer, unfortunately, a significant injury. What about the type of method used to take down Mr. Patel? I mean, a leg sweep has—there are certainly issues related to it. And whether officers—you know, it's certainly come under criticism. And then if he hasn't been trained on how to do it, it does—with the leg sweep, there's nothing, especially with the hands behind the back, there's nothing that the person being detained can do to break the fall. What about the effect of that leg sweep? There's about three questions there, Your Honor, and I want to try to make sure I cover them all. First, with respect to leg sweeps, even the district court noted that there are cases where a leg sweep is appropriate. Obviously, she didn't feel this was one, but there are cases where she deemed it's appropriate. But the second thing is, Officer Parker denied that he utilized a leg sweep. And the only two experts in this case on use of force, both Chief Dunstan as well as Jack Ryan, also said that wasn't a leg sweep. Well, you can see his leg moving and brushing the other leg out from underneath. And I know he said, well, they just got tangled up when I was taking him down. But, I mean, when the video appears to clearly contradict, doesn't it become a question for the jury? Your Honor, not—well, it was a trip, which is a takedown. It's not a question of the jury because of this court's prior precedent, which says a takedown is de minimis force. And typically, it's a takedown that's had something beyond what we have here. For example, in— Did your client not believe that at the time that Mr. Patel was in his 70s and he had a slight frame of 115 pounds? I thought he was younger than that. He was. I'm just asking whether your clients believed that he was an older gentleman at the time. He believed he was certainly older. I don't believe he testified as to he was in the 70s. I don't believe that he testified that the difference in size was as great as the plaintiff has asserted that it was. But in any event, your Honor, when he took him to the ground, he did so consistent with cases like Croon, where you had a 67-year-old woman that was handcuffed—excuse me, not handcuffed, taken to the ground, and a foot was placed in her back for 10 minutes. We don't have that here. That was de minimis. You've got Nolan B. Isbell, which is widely cited. A 17-year-old was taken from behind by the shoulder. He's thrown against a car. His head is pushed into the side of the van. His area, his growing area is searched. He's handcuffed. That was de minimis, Your Honor, under this circuit. You've got DeRuthy v. Pastor, where it was not even—it was a minor incident. It was actually a television reporter. Those other factual patterns are informative, but the question here really is one of whether it is obvious or not. The obvious response to the fairness of an officer has to be to have notice of the kinds of— Yes, Your Honor. —of what he's allowed to do and what he's not allowed to do. But takedowns and this kind of confrontation is very basic to police training. That's what week after week an officer is trained and you officers are trained, and that's part of the basic training itself. This is not some collateral thing. Walking up, and it's very important the officer do what they did, to challenge an individual that seemed out of place. I'll put that to one side for a moment, and that's what they did. But having approached him, they had the man fully secured. Now, you say he's concerned about weapons. He's fully secured. There are two officers. The other officer can pat down if there's any questions, and they should do that but be concerned about weapons. But they didn't do that, and that's the divergence. Well, that raises a lot of different questions, but that's what troubles me. Your Honor, if I may, he wasn't fully secured. He had two thumbs. But if you look when the technique starts and when he starts to fall, Mr. Patel has his left arm free. And, in fact, according to Officer Parker, he had broken free. Mr. Patel, the plaintiff said he's not sure if he moved his hand or not or if it got free. So that was free. But, secondly, Your Honor, what he didn't have at that point is he didn't have the pat-down completed. He didn't know if there were weapons. And what the case law tells us is that a takedown is okay, and even for him. You're talking about he, there are two officers. Yes, sir. What was the other officer doing? Well, the other officer wasn't with the training. He was watching. But, Your Honor, Graham tells us we don't look from 20-20 hindsight. We look from what's happening. And there are a variety of techniques. Frankly, Your Honor, Judge Branch, in the imperfect world, and sometimes you have to use techniques that aren't trained or unconventional. And that's what happened here. The problem in this case seems to be everyone is concerned about the injury. But I would remind this court, if you look at Rodriguez, for example, in that case. It's really not just the injury. I mean, the injury is obviously awful. But there's no way for an officer to know how a given technique is going to affect a particular individual. My problem is that it does seem like an awful lot of force used under the circumstances. And Croome, to me, seems distinguishable. I mean, my recollection of that case is that the woman who was taken down was in a squatting position at the time, which is far different from a man standing up completely and falling to the ground with that kind of force. I mean, it just seems different to me. Your Honor, I see my time is up. You can answer. One of the things that Jack Ryan, who was one of the two excess force experts here, mentioned, is that when an individual is in that close of proximity, if he starts to turn to the officer, the officer is in imminent danger because, frankly, he can get the officer's gun. He can grab his belt, any of those sorts of things. And so when you consider the context and how close these two individuals are and what's happening, it makes absolute sense that an officer would default to something they're taught. That is a takedown and something that this court has repeatedly approved. And that's why qualified immunity should have been granted. Thank you, Your Honor. Thank you. Good morning. May it please the Court. I'm David Knopp. I represent the city of Madison in this case. I won't repeat a lot, but I feel like in context, context is very important. Context is everything here. I feel like I should start by acknowledging that all of us in this room or most of us are lawyers. We approach everything from an analytical perspective. That's not the way police officers have the luxury to operate. Police officers have to run toward the danger and take action immediately to make sure that the citizenry is protected. Lawyers, we have the luxury of sitting here and analyzing each and every fact and possible outcome. That's just not available to a law enforcement officer. Two specific cases that I don't even think Mr. Anderson had the chance to mention specifically say, and these are 11th Circuit cases, that takedowns are appropriate in these sorts of situations. One of them that I'd point out is Myers v. Bowman's 2013 case. In that case, the de minimis principle was applied, didn't even reach qualified immunity. A deputy had completed a traffic stop on a subject who was suspected of felony theft of a dog, by the way. Here we have burglary. The deputy reached through the open window of a truck, grabbed the subject by the arm, threw him on the ground, and got on top of him. There were no furtive movements. There were no weapons. This court did not tarry in finding that that is de minimis force. Similarly, in Duruthi, which was mentioned, a cameraman wrestled to the ground, mentioned that he had a medical concern with his arm, but was still thrown to the ground and suffered some pretty significant injury. But this court said an officer can't anticipate what level of injury a person has when they walk into a scene. An officer has to take action. Probably the most extreme example is the Rodriguez case. I don't know if you remember that. This is an individual who had just gotten out of a motorcycle accident and was leaving the hospital. He was handcuffed through a maneuver that forced his arm up behind his back and placed onto the ground. His arm was amputated. He had 25 surgeries as a result of the officer's actions. But this court said we can't let bad facts make bad law. And that's exactly the case here because, again, if I return to the context. But, you know, particularly with the case with regard to the individual who had suffered a fracture and then a repair already earlier and then when he was taken down, bone fragments were severed, et cetera. He lost it. He lost his limb. And you're talking about the unanticipatable facts. And, of course, that's the case. The question here, though, is a little more difficult, is that if the force here is one thing about a used force and there's an unanticipatable consequence because the individual is fragile, you know, the eggshell of difficulty. Here the argument is, as I understand it, that it's fully anticipatable, healthy or not, that the takedown comes with a high risk of injury. Well, actually, Your Honor, I would suggest not. There's undisputed testimony in this case from Officer Parker that he had used a takedown technique multiple times in his career without any significant injury to anyone. The biomedical testimony in this case says that Mr. Patel suffered from a form of spinal stenosis, narrowing of the spinal canal, so significant that if he had even just fallen down on his own that day, he probably would have had the same injury. So we also had our use of force experts' testimony that said this is standard training. When you've got someone who, and again, I'll point to the video, moves in the course of this personal contact zone in this area, the job of the officer is to get them on the ground as quickly as possible. Other techniques that could have been used, such as an armbar takedown, the testimony established would have been more dangerous and, in fact, would have put Mr. Patel's head on the concrete if it had been utilized. Judge Heikkila found there was a criminal case against Officer Parker. She entered a 100-page opinion acquitting him. In that opinion, she found that the movement of Mr. Patel, where he turned his head, moved his leg, and I can point you to where that is, occurred in Officer Parker's personal contact zone, when he was inches away from Mr. Patel, which Judge Heikkila found is the most dangerous contact zone. Counsel, what's the basis for that turning movement? I understand that the district court found that. Was there testimony to that effect? Your Honor, Mr. Patel admitted that he turned his foot and his head in the immediate moment. Officer Parker testified to it. Forensic video analyst, Grant Fredericks. It moved his head, but we're talking about any more movement than that? Yes, sir. And what I would do, I would recommend, in the record, there is a report from Grant Fredericks. If you open the report, you can click on a video. It's called deinterlaced. What he did is he adjusted the video to make sure that it's not borrowing images from different areas. It's a recording technique. And when you use that deinterlaced video, you can clearly see that in the moments before the takedown, Mr. Patel steps a foot out, moves his head, and turns toward the officer at this critical time. So it's undisputed from every single witness, including Mr. Patel. What Jack Ryan, the city's use of force expert, testified is that officers are trained, do not let, under any circumstances, do not let that subject turn around. Because up to 15%, he cited statistics, 15% of officer fatalities are with their own gun. So Officer Parker had a choice. Really, he had no choice, actually. He had to get Mr. Patel on the ground at that point. Now, yes, we can sit here from our chambers and we can look at this and say, oh, gosh, what a terrible mistake. But he didn't have that luxury, and he didn't know exactly what was going to happen. But when you look at the video, I mean, really, if you look at that video, and I've looked at it many times frame by frame, it is the most minuscule movement. I mean, it really is. There's not, I know that it was described as a jerk, but if you look at it, it doesn't look like a jerk on the video. The foot, it looks like he's just trying to stay standing up. I mean, because he's been standing in that position at that point for a little bit of a while. I mean, it does not look at all like there's any kind of a sudden movement or a large movement. It seems like a very minor kind of trying to keep one's ground. Do you disagree? And if you do, tell me what I should be looking at. As a lawyer, I do understand where you're coming from. But as a lawyer who's represented police officers for more than a decade, I see it differently. And a police officer receives the training that that minor movement is the sort of thing that can precede a major movement, such as taking a gun or some other action. So we cannot substitute our judgment for the judgment of the officer on the scene because he wasn't sitting in his car looking at this through the video. He was perceiving it and feeling it within inches of someone who he thought or had reason to believe was committing a robbery or a burglary, excuse me. So he, while it may look minor to us, it's not the court's job or my job or anyone else's job to substitute our judgment for that of the officer. It's not, but it is our job to review it and make sure that there is a legitimate and reasonable basis for the officer to have done what he did. I agree. And in this case, that minor movement is enough for us to reach that conclusion. I feel quite confident. And in fact, that was the undisputed testimony of the law enforcement experts. If I could take 30 seconds and just encourage the court to do one thing. The constitutional issue raised by Officer Barker is the same issue raised by the city. I understand jurisdictional questions were raised earlier as to whether it was appropriate to reach that. But the Supreme Court has made very clear in the Qualified Immunity Inquiry that it is beneficial and has a salutary effect of giving clear guidance to local officials when we actually reach that constitutional question first in the course of that analysis and not make everyone wait until the end of the case to reach that issue. So I'd encourage the court to do that. And my time has expired. Thank you. Thank you. Good morning. I am Hank Sherrod. I represent Surge Patel. I'd like to talk to you about the evidence in this case. And I realized getting ready today that maybe I have not done as good a job putting the video in proper context. I think the testimony from Officer Barker is critical here. Officer Barker never claimed in his internal affairs interview, in his deposition testimony or otherwise, that he felt some teeny tiny movement that scared him and that he took Mr. Patel down. No. He said that Mr. Patel, on four separate occasions, jerked away from him. And that it was only – he would never have taken somebody down just for minor movement. That happens. And that he did so because he jerked away and he took him down to pat him down. That is what – there is absolutely no evidence in the record from a witness that this action was based on some teeny tiny movement. It is also the case, of course, that Mr. Patel testified. And Mr. Patel testified that he was still – that exact word – and that he saw the movement that the defense lawyers showed him on the video. That's the context. And he said he moved because of Officer Barker. And as Judge Higginbotham noted, there was in fact – it can be seen on the video – a preparatory movement. But we don't have to wait to the video to know that it's preparatory. Okay? For a reasonable jury to find that in fact Officer Parker's intention was to take Mr. Patel down. Because despite no jerking away, for many seconds leading up to the moment of the takedown, Officer Parker stated on the video for everyone to hear off of the mic, stop jerking away or I'm going to take you down. So in that context, what the defense in this case has tried to do is take these little tiny movements without any testimonial support and say those were reason. There's no officer that cared about these movements. There's an officer, for reasons that I could guess at but are not pertinent to this court, made a decision, maybe as a training exercise, that he was going to take this vulnerable man – and vulnerable like any older person of limited weight, of some age, speaking as a person who had neck surgery a few weeks ago. I think what they're saying is that the more longer you live and the more you are vulnerable to police, the more freedom police have just to take you down. I mean, I don't think they're saying that. Well, they're trying to say, though, that it's Mr. Patel. They want a pass. Maybe that's a bit of an exaggeration. They're saying we get a pass completely because Mr. Patel had preexisting unsymptomatic spinal stenosis. But they don't say, and I think this is critical. I don't think I have ever heard them say that Officer Parker could just, because he wanted to, as a training exercise or otherwise, just slam Mr. Patel to the ground. They've never said that without resistance, without some rationale. Maybe they'll tell you in their remaining time if I'm incorrect. But what they've done this entire case with the district court and on appeal is try to say these little movements and this stuff that Mr. Patel did over a minute before the takedown create this danger and whatever so that to complete the pat down, he had to be not just taken to the ground. He could have been cuffed. He could have been patted by the trainee. He could have been any number of things. A hundred fifteen pound man who's restrained behind his back. Any number of options that obviously Officer Parker had. But one option that he didn't have, at least as I read the court's cases and his comments, this is just for no reason because that is in the light most favorable to plaintiff. There was a decision made in advance of the alleged cause. So let me ask you a question about the police officer. I didn't remember this in the video, but he was armed, I assume. Where was he wearing his weapon? You know, as far as I know, all of his weapons are on his duty belt. OK. Well, one of the concerns, of course, and as counsel opposite points out, is always the first. First is whether the subject has a weapon. But the other is a reality that he's got one, too. So possession of the weapon is fundamental to the. Absolutely. But the Mr. Patel testified first. They can't check both of both of his pockets. Mr. Patel testified that he cooperated in whatever they wanted to do. If there was, in fact, a legitimate concern about a weapon, there was nothing. One, they did a search. It revealed nothing. And there's nothing about this encounter that a reasonable officer would perceive, at least in the light most favorable to plaintiff, as indicating. Let me be a little clearer if I can. Did the officers conduct any pat down before they had to take down? Yes. They searched, checked both of his front right pocket and his front left pocket. OK. According to Mr. Patel's testimony, I believe that's supported by the video. OK. So there is evidence that he could conclude that they conducted a pat down. How was he dressed? Did he have a jacket on? He had a white sweater on and a pair of khaki pants, as I recall, Your Honor. OK. OK. All right. What about Mr. Patel's prior efforts to walk away? So let's, I think a reasonable officer, as I believe the court's questions indicated, would not have understood that to be any kind of fly. But I want to direct this court's attention to sort of a seminal excessive force case in this circuit, which is Smith v. Maddox. In that case, the suspect had a baseball bat. He ran. He eventually gave up the baseball bat and submitted. And as the officer was cuffing him, the officer broke the man's arm. Single force while he had submitted. And there are other, there's more recent cases. But essentially, this court's jurisprudence has always been is that, you know, you can't just say something happened a minute or two ago. And so we get to use excessive unnecessary force on you. Analyze the factors at the time that the officer is using force. The other thing I want to be clear about. Certainly in that case, the baseball bat, which was a problem, is no longer a problem. Here we have a gentleman who has tried, who has walked away. I'm not saying fleeing or running, but has walked away from the officers several times before. That issue has not disappeared like the baseball bat in the case you've cited. So how do we view when the officer, the totality of the circumstances, has seen a gentleman who has repeatedly turned away and acted to leave? So putting aside the fact that a reasonable officer, in fact, these officers perceived a language barrier. But let's say you thought maybe he's trying to get back to his house for whatever reason. In the Smith case, he also fled. And the issue is, what is the person being compliant at the time of the force's use? The walking away has disappeared under the facts in this case. Mr. Patel is now being restrained behind his back in a reverse prayer situation and letting the officers, according to his testimony, do what they want to do. And the next thing he knows, the officer leg sweeps him such that he impacts the ground, which could have the potential to injure anyone. So that's from plaintiff's perspective. You can't bootstrap a little walking away earlier into a justification that may have justified. At this point, we're not at issue, the detention. There's no issue about the pat down. The only issue is if Mr. Patel says, I'm cooperating, I was still, the officer did this to me. It's not contradicted by the video. Can Officer Parker constitutionally, just for no reason whatsoever, execute a leg sweep on him? Well, at this juncture, our question to frame it is whether resolving all questions and issues of fact in your favor, a jury could determine the police officer looking objectively could reasonably have perceived the necessity for the force that was used. So I remind that the officers carry immunity all through the trial, all through the case. And there was a while back when most of these officers' cases were tried, and I tried them as a district judge and went to juries. And I never had a jury find anything about the officer. They saw the officer's viewpoint. They were very sympathetic to it. The only point is that this is not the – this is just an intermediate step, but it's very important in itself because Supreme Court has made it a very important step. And so it's a question of where are the disputed issues of fact, resolving them in your favor, from which a jury could determine that this officer used unreasonable force, not subjectively, but a reasonable officer could perceive that, the necessity of the force. Correct, Your Honor. So let me, I guess, turn to a couple things. One, Officer Parker's internal affairs interview, he clearly states in that interview that he did a leg sweep. He did not claim in his first – that there was any lack of balance or any of these other issues that now are being raised, of course, now that there's litigation. He didn't claim anything other – well, it doesn't matter what he claimed, except on the point that this was a leg sweep. He recognized it as a leg sweep. The court's de minimis force cases are – none of them say you can use significant force with no justification. The de minimis force cases are obviously intended to give officers a little bit of breathing room to reasonably do their job. And so when you have some noncompliance and a need or you're in a situation where you're doing an arrest, this is not an arrest. This is not a situation in the light most favorable to Mr. Patel of noncompliance. You have somebody that's under control. The only reason he's not cuffed is because the officer has not cuffed him. If he's not completely searched, the only reason he's not completely searched is because for whatever reason, Officer Parker has chosen not to search him. In fact, what Officer Parker has – in the light most favorable complaint, what Officer Parker has chosen to do is to take him down because he says long before – when there's no jerking away, he is making an audio record. If you don't stop jerking away from me, I am going to take you down. So in the light most favorable complaint, if we have compliance, we have no issue of danger, no current issue of flight, we have submission, and we have use of a technique that the officer says one, he's not trained on, that no court – and I'm hesitant, but to my knowledge, and defense has never pointed to a case that says, you know what, if you have a compliant individual who is not any kind of a danger, who is not subject to arrest, that you can come up to that person and execute a leg sweep on them. There is only a case, and reasonably so, saying that you're not going to second guess an officer who's dealing with a violence from somebody, resistance from somebody, and they happen to use a leg sweep. What about the interlaced video, which I have not seen? I've seen the videos embedded in your brief. The interlaced video in Grant Frederick's video, in his report, where it says you can see Mr. Patel's leg move. It is not disputed that if you look and you can see the little bit of head movement and a little bit of foot movement. Those are shown in my videos. The one that's embedded in the brief is also shown in Grant Frederick's video. Now, I don't recall if – it also, if you look at the video, though, it shows the preparatory positioning and movement by Officer Parker before the minor movement. And again, I would just remind the court there's no testimony in this case from Officer Parker that he perceived any movement. Other than alleged four times jerking away, and because the jerking away was interfering with his ability to pat Mr. Patel down, he had to take him down in order to complete the pat down, which is obviously demonstrably untrue from the video. But regardless, in the light most favored or plaintiff, shows that the decision to take Mr. Patel down had been made even before these tiny movements. There's no testimony to support these tiny movements. And there's preparatory motion by Officer Parker on the video before these tiny movements. I've seen no case in this circuit that would suggest that an officer can execute a significant take down that puts somebody at risk of injury for no legitimate reason. And in the light most favorable to plaintiff, that's the case. Now, I realized in getting ready for oral argument that there was a case unpublished, but which I had not seen. And it's not a leg sweep takedown, but it's an armbar takedown case. And it's Landsman v. City of Vero Beach, 621 Fed Appendix 559. And the discussion is primarily page 562 and the diminished force and footnote 5. In that case, somebody had pursued to their apartment after a traffic stop where they were suspected of DUI. And the woman got to the door of apartment and the officer came up to her and executed an armbar takedown such that her face hit the ground. And she suffered multiple injuries. And this court affirmed the denial of qualified immunity. Now, more recently, that was a 2015 decision that I did not, to be honest with you, find until yesterday. On March 14, 2019, in Sebastian v. Ortiz, this court discussed in a handcuff case extensively the de minimis force cases, including Nolan v. Isbell. And I believe it can be read to say that if you have serious and permanent injuries, that takes you out. That alone takes you out unless you're somehow in the extraordinary vulnerability situation as in Rodriguez. And the Sebastian case is unpublished from our... It also discussed the notice. So this is where we get to what is the officer on? Does he have fair notice? In that case, this court discussed at length Smith v. Maddox. Because in that case, it was an issue of handcuffs being allowed to remain on the individual while they were causing injury. They noted that in Hadley v. Gutierrez, there was a single punch to the stomach. If a single punch to the stomach on a handcuffed arrestee gave notice about gratuitous, unprovoked force. They also discussed Levy v. Ferreira, in which a handcuffed individual was slammed against the hood or the trunk of a car. In those cases, in the Smith v. Maddox case, we have a broken arm, a single incident. All three of those are single incidents. Broken arm, punch to the stomach, and a head slam to the rear of a trunk. None of those involve serious impermanent injuries except for Mr. Smith because of the broken arm. All of them went back for arrestees. Now, they were cuffed, but while Mr. Patel was not cuffed, he was restrained. And the only reason he wasn't cuffed was the choice of the officer. And those cases gave notice. And there are other cases that rely particularly on Smith and Hadley and Lee and a few other cases as giving notice. But frequently, this court, in addressing this situation presented here, say, alternatively, even if those cases are not considered close enough, that this is, if you have an unprovoked use of force against a compliant nonviolent individual, if it's gratuitous, that that is an obvious situation where any reasonable officer would recognize the unconstitutionality of their conduct. If it matters, I would note, again, in terms of the internal affairs report, that there was no, he was specifically asked about the situation with Mr. Patel and didn't talk about any history of burglaries. He just said there had been burglaries some distance from where Mr. Patel was. In some regards, what you see on the video is not just on the video. It is backed up by the testimony of Mr. Patel that he was still, that he was compliant and that any movement on the video was because of what Officer Parker did wrong. There is, in contrast, no testimony from Officer Parker that he did this because of minor movements. Now, you can get a, pay money to all these experts to come and say, well, you know, minor movements could be danger, but there is no basis in this factual record for any decision by this court that, you know, oh, he was only, as a factual matter, reacting to Mr. Patel. In any construction of the facts in the light most favorable to plaintiff, even if you toss out the video, what we have is unjustified, unprovoked, gratuitous violence that this court has repeatedly, and to my knowledge, no court in this country has ever said that an unprovoked leg sweep or any kind of similar violence that causes serious injuries is constitutional and protected by qualified or protected by qualified immunity. If this court were to reverse Judge Hopkins, it would be an outlier among all the cases analyzing anything like this from its own jurisprudence. There have been like three or four or five cases since my brief was written out of this court. Most of them unpublished, applying the same line of cases of gratuitous force to deny qualified immunity and to affirm denials of summary judgment. And the district court did it right here, and I'd ask you to affirm. Thank you. Thank you.  Thank you, Your Honor. We all look to Graham, and what Graham says is that the use of force must be judged from the perspective of a reasonable officer on the scene, rather than 20-20 vision or hindsight, and also, quote, without regard to the underlying intent and motivation of the officer. And when we look at the Graham elements, it talks about the severity of the crime, first and foremost. We've got that. We've got a burglary. We have said that is a major crime. It talks about whether the suspect poses an immediate threat. At the time he was taken down, we've got that. If he makes that turn, our officer is in danger. And then we talked about whether he was actively resisting arrest or attempting to evade. And if we look at the record, Your Honor, these things aren't undisputed or aren't disputed. There is no question he walked two steps away, seven steps away, nine steps away. The plaintiff has conceded there was head movement and a step immediately before the takedown. It is undisputed that Mr. Patel cannot answer even the most basic questions about his identity. And I notice my clock is not running. Or just mention that. About identity or why he was there or anything else. So in this context, all of the Graham factors on the undisputed record favor Officer Parker. I just don't see it that way. And getting back to your point about, you know, he was trying to evade. I mean, the officer said at the time he didn't understand English. So how can he take that as an intent to evade? It's not like he was running, trying to hide. He was slowly walking away. And the officer believed at the time that he didn't understand English. Well, he certainly, Mr. Patel, the plaintiff, certainly wasn't answering the basic routine questions that could have ended this analysis very quickly. Could have ended the investigation. Again, he has an English problem. And so what happened is, is each time Officer Parker takes a little more control of the situation, ultimately resulting in the pat-down, which the court found was a lawful pat-down. It is also a pat-down that undisputedly was not completed. Mr. Patel did say he reached in my pockets. Mr. Patel didn't say that the pat-down was ever completed. So at no point did Officer Parker come to the conclusion that Mr. Patel was not armed. And at that point, for whatever reason. So what part of the pat-down does Mr. Patel say occurred? Mr. Patel said that the officer reached into his pockets, Your Honor. Where else would he have had a gun? I mean, he was 115 pounds and slight of frame. Your Honor, I don't know that weight determines whether or not you can carry a gun. No, I agree that it doesn't. But the point is, if he perceived him to be slight of frame, and he appears to be slight of frame in the video, and he's checked his pockets. I mean, it's not like there are a lot of places he could be hiding it. Well, Your Honor, and like Mr. Knopf, I've represented officers for about 20 years. And when you've got sweaters, jeans, which is actually what he had on here, jeans. He checked his pockets. All his pockets and his pants. You can have a gun. You can have knives, razors. There's any variety. You can have tasers. I mean, there's any variety of potential weapons that an individual could be carrying with them. I mean, in their shoes, excuse me, socks, under their sweater. And that's what Officer Parker was trying to ascertain. But here's the other thing, Your Honor. We talked about whether or not Officer Parker was on notice that a takedown might be unconstitutional. And was it clearly set by the case law? I'm not aware of a single case in this circuit where there is a situation where an unhandcuffed suspect has been taken to the ground that appeared to the reasonable officer on the scene to be resisting or at least to not be in control. And this court held that was a constitutional violation. But we do have a number of cases that talk about gratuitous use of force. We do, Your Honor. And Stevens was one of them, for example, that was brought up. And that was a relatively new case. And for Judge Branch, it's actually 852 F. 3rd 1298. That was a case, though, where there was no dispute. There was no dispute that there was absolute compliance from the suspect. And, in fact, he was also arrested for or being arrested for a minor offense. He was speeding. And then the handcuffs were put on. And the court noted it was an unusual case because the suspect complained about the handcuffs being too tight. The officers took them off, put a second set on, and made them even tighter. That's gratuitous force. It's things that happen over time. He was also in the handcuffs, I think, for five hours, if I recall. Here, we've got one use of force that lasts seconds. He took a suspect. But it's a pretty significant use of force. I mean, look, here's what my thought is on this. If we think that the use, and it may or may not have been gratuitous, but if we think that there is a material dispute over whether the use of force was gratuitous, we have said in a variety of different circumstances that when use of force is gratuitous, that is a violation. That's a violation. So that would put the officer on notice. So to me, anyway, it comes down to whether there is a material issue of fact as to whether the force was gratuitous. Do you disagree with that? I do not, Your Honor. But I think given the facts here, if I may finish the question, just the issue of what we know happened on the video, what they concede, the issue of what we know happened before that, and the real possibility that this individual could have had a weapon and was not under control, combined with all of the cases that say a takedown in this context is okay, and the expert testimony means qualified immunity should be granted here. Thank you, Your Honor. Thank you. Mr. Connell. Thank you, Your Honor. I heard portions of Mr. Sherrod's testimony and wondered if I was sitting in the same case. This is not a case where an officer just walked up to a person standing on their doorstep and body slammed them or armbarred takedown. This is a case in which officers walked up to a gentleman and repeatedly asked him to stop walking away. He finally got nine steps away from them before they finally corralled him and started taking action against him. When finally they did take him to the ground, it wasn't completely clear what he understood and what he didn't understand. He certainly had returned to the officer several times. In fact, he testified he knew he wasn't supposed to walk away from police officers. The officers didn't know that at the time. I mean, we have to look at what the officers knew at the time. At the time, the officers repeatedly said he doesn't understand English. The officers testified they did think he understood enough English to comply because he repeatedly did comply with their commands. Maybe, but what they said during the actual events was he doesn't understand English. They didn't say it just once. They didn't say it just at the beginning. They said it multiple times throughout the events that occurred. And don't we have to look at the facts in the light most favorable to the non-moving party? So don't we have to then, I'm not, you know, look, if it's a jury issue, the jury will decide who they're going to believe. However, aren't we required then to look at the facts here as I've just described them? And that is that the officers understood that he did not understand English. I don't think the officers testified that they fully understood that. I think they certainly… I understand that the officers did not, you know, the officers may not have thought that eventually. But based on what the officers said at the time, why is it not a reasonable inference in favor of the non-moving party that the officers understood that Mr. Patel did not understand English at that time? Even if Mr. Patel understood not a lick of English, officers still have to react to people that move and exhibit resistance, and that's what happened in this case. Mr. Sherrod, I should mention, pointed out the Sebastian case that came out very recently. It's very important to point out that that was a handcuffing case. This court has a general rule that applies to handcuffing cases. In the case of painful handcuffing, there's a carve-out, okay? And the court's always said that. So the Sebastian case is merely an explanation of that rule. This is not a handcuffing case. Serious injury does not make any difference. And, in fact, this court's prior panels, prior to Sebastian, which is also a panel opinion, have repeatedly acknowledged that. And so, again, I'd request that the court reach the constitutional question and reverse the district court on that point. Thank you. Thank you, counsel. We'll be in recess. All rise. Thank you.